UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

N⁰ 04-CV-3876 (JFB)

———————

RICHARD DOWNES,

Plaintiff,

VERSUS

JOHN E. POTTER,
Postmaster General,

Defendant.

———————

MEMORANDUM AND ORDER
July 26, 2006

———————

JOSEPH F. BIANCO, District Judge:

Plaintiff Richard Downes brings this action alleging employment discrimination on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII") against John E. Potter, Postmaster General. Plaintiff, who is an African-American male, asserts that he was terminated from his position as a probationary employee for the United States Postal Service ("USPS") as a result of his race. Defendant now moves for summary judgment. For the following reasons, defendant's motion for summary judgment is denied.

I. BACKGROUND

A. THE FACTS

Construed in a light most favorable to plaintiff, the non-moving party, the facts are as follows:

1. Plaintiff's Job Position at the USPS

Plaintiff began working as a motor vehicle operator (MVO) for the USPS on May 3, 2003, and was assigned to the Mid-Island Processing and Distribution Center ("Mid-Island"). (Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 1.)[1] Plaintiff was in a 90-day

---

[1] Where only one party's 56.1 Statement is cited, the other party does not dispute the facts alleged

probationary period during the start of his employment and, thus, such period was scheduled to end on August 1, 2003. (*Id.* ¶ 3.)

When he began working for the USPS, plaintiff received approximately two weeks of classroom training and three days of on-the-job training. (Downes Dep. at 39-42.) During the classroom training, plaintiff and his colleagues were instructed that, if they were delayed in completing their assigned route, they should contact a supervisor via two-way radio. (Downes Decl. ¶ 6.) In addition, trainees were told that motor vehicle accidents would not be tolerated, and that nearly every such incident caused by a probationary employee would result in termination. (Downes Decl. ¶ 6; Downes Dep. at 38.)

After completing the assigned training, plaintiff began operating a USPS vehicle on a daily basis. (Downes Dep. at 42-43.) Although drivers had designated shifts and regular routes, the assignments for probationary employees changed based on daily needs. (Downes Decl. at ¶ 7.) Therefore, probationary drivers, such as plaintiff, received assignments upon arrival at Mid-Island for work each day and his shifts and routes varied. (*Id.*; Downes Dep. at 44, 58.) The vast majority of the time, however, plaintiff worked Tour 3. (Downes Decl. ¶ 7.) Plaintiff reported directly to Andrew Chieffo, who was the Supervisor of Transport Operations ("STO") assigned to Tour 3. (Def.'s 56.1 ¶ 9; Downes Decl. ¶¶ 6-7; Downes Dep. at 44-45.) Chieffo is white. (Def.'s 56.1 ¶ 16.)

From the time he was hired until the

---

or has offered no admissible evidence to refute the fact.

incident on July 22, 2003, plaintiff received good reviews regarding his job performance and was never warned or disciplined for inadequately performing his job as a driver. (Downes Dep. at 46-47.) During that period, plaintiff was only criticized once, when he completed his route ahead of schedule and parked his truck when he returned to Mid-Island in an area that was blocking other trucks and he did not leave his keys in the ignition so his truck could be moved. (Chieffo Dep. at 114-15.)

2. The July 22nd Mail Delivery Error

The articulated basis for plaintiff's termination was an incident on July 22, 2003, when plaintiff unintentionally deviated from his assigned route and, according to defendant, caused a mail delivery failure. The following evidence is contained in the record concerning the events of that day.

On July 22, 2003, during the probationary period, plaintiff was assigned a job that required him to go first to the Huntington Post Office to pick up mail for Mid-Island and then go to New Jersey with a different trailer of mail. (Def.'s 56.1 ¶ 4.) Plaintiff, however, misread his route assignment sheet and mistakenly headed towards New Jersey, instead of going to Huntington Post Office first. (Def.'s 56.1 ¶ 5; Downes Decl. ¶ 9.)

Less than an hour after leaving Mid-Island, plaintiff realized that he was not following his route properly. (Def.'s 56.1 ¶ 6.) Plaintiff made various and repeated attempts to contact Chieffo, the supervisor on duty, to advise him of the error and to seek guidance to correct the situation, but was unable to make contact with Chieffo. (Downes Decl. ¶¶ 10-11.) Those unsuccessful attempts included the following: making radio

calls for approximately five to ten minutes; using his cellular telephone to call Mid-Island; calling co-workers on their cellular phones to ask that they relay a message to Mid-Island; calling the operator to ask that she connect him to Mid-Island; and getting the attention of other drivers on the road to have them attempt to contact Mid-Island. (Def.'s 56.1 ¶ 7; Downes Decl. ¶¶ 11-12; Downes Dep. at 63-69, 72-73.) These attempts failed because plaintiff's two-way radio did not work properly and because Mid-Island was unable to receive incoming calls due to a power outage that disrupted telephone service. (Def.'s 56.1 ¶ 7; Downes Decl. ¶ 10; Chieffo Dep. at 147.) Having failed to reach anyone, plaintiff continued to the New Jersey facility. (Def.'s 56.1 ¶ 8.)

Eventually, fellow driver Annette Maldonado was able to contact someone at Mid-Island who agreed to relay the message that plaintiff has missed the Huntington Post Office stop. (Downes Decl. ¶ 13; Downes Dep. at 76-78.) This was communicated to Chieffo and a different driver was sent from Mid-Island to Huntington Post Office to pick up the mail. (Def.'s 56.1 ¶¶ 9-10.) As a result, the mail from Huntington Post Office was brought to Mid-Island three hours late. (*Id.* ¶ 11.) According to defendant, that delay had the following consequences: (1) Express Mail from the Huntington Post Office did not make its scheduled time to the airport and thus was not timely processed; (2) there were delays in the processing of other services of mail as well; and (3) the Huntington Post Office was required to stay open later than its usual scheduled time in order to wait for the mail to be picked up. (Def.'s 56.1 ¶¶ 12-14.)

Chieffo testified that, during a telephone conversation at approximately 8:00 p.m. on July 22, 2003, Chieffo told Acting Plant Manager Henry Johnson what had occurred and Johnson directed him to terminate plaintiff. (Chieffo Dep. at 78-83; Supplemental Declaration of Dennis McGinn, Ex. S, at 2; Stark Decl., Ex. E.) At that point in time, no explanation had been sought from plaintiff regarding the incident, no incident report had been completed, and no investigation had been conducted. (Downes Dep. at 80; Chieffo Dep. at 72, 80-82, 89-90.) Johnson, however, denied any recollection of directing Chieffo to terminate plaintiff that night, or at any other time, and testified that he would never decide to terminate an employee or recommend such action until an investigation was conducted, including questioning the driver to determine the reason for the delay in the transport of the mail. (Johnson Dep. at 52-57, 73-76.)

According to plaintiff, upon his arrival to the New Jersey facility at approximately 9:00 p.m. on July 22, plaintiff continued his attempts to contact Chieffo. (Downes Decl. ¶ 14; Downes Dep. at 80.) Although these attempts failed initially, the New Jersey dispatcher was able to reach Chieffo by radio. (Downes Decl. ¶ 14.) Chieffo spoke to plaintiff for 15 seconds and plaintiff explained that he misread the route assignment and had unsuccessfully tried to contact Mid-Island by radio and telephone. (Downes Decl. ¶ 14; Downes Dep. at 80; Chieffo Dep. at 72.) Chieffo knew that telephones were not working properly that day and stated at his deposition that, if plaintiff had successfully reached him within one-half hour of leaving Huntington and identified the mistake, the mail would have still met its critical entry time and he would not have been terminated. (Chieffo Dep. at 147-48.) At Chieffo's request, plaintiff prepared a statement explaining the circumstances of his error. (Def.'s 56.1 ¶ 18.) Chieffo discussed

plaintiff's conduct with Craig Barnes, who was then Acting Manager of Transportation Networks, which is a supervisory position above STO, and Barnes asked Chieffo to prepare a statement of what had occurred. (*Id.* ¶¶ 19-20.) Barnes is black. (*Id.* ¶ 21.)

### 3. The Termination

On July 23, 2003, plaintiff returned to Mid-Island and met with Barnes and a representative from the union to discuss what happened on July 22, 2003. (Def.'s 56.1 ¶ 22-23.) Barnes reviewed certain documents regarding plaintiff's failure to properly perform his job, including a statement from Chieffo, plaintiff's statement, plaintiff's trip report, and a report from a Postal Service computer system regarding delivery times. (*Id.* ¶ 24.) Barnes also requested that an employee test plaintiff's radio, which plaintiff stated was not functioning. (*Id.* ¶ 25.) Upon reviewing these documents, Barnes questioned why plaintiff did not return to Mid-Island after first realizing his mistake, since he stated that he was still on Long Island. (*Id.* ¶ 26.) Barnes found that decision by plaintiff to reflect poor judgment. (*Id.* ¶ 27.) During this assessment of the circumstances, Barnes also questioned how plaintiff could have misread the trip sheet because, based upon the times and locations on the sheet, Barnes believed that plaintiff should have realized he was missing part of his assignment. (*Id.* ¶ 28.) Barnes then prepared a termination letter which stated:

> The reason for this [termination] decision is that on July 22, 2003, you were assigned to Job 680, which begins at 1740. This job sheet has two trips on it – the first (6147) goes to Huntington Post Office; the second (9523) goes to NJI & BMS/DVD. You stated that you didn't see the complete job sheet when it was given to you because it was obstructed by the NJI & BMC trip ticket. So you hooked up to the trailer designated for trip 9523 and left 1.25 hours early for New Jersey. On your way to New Jersey, you realized there was an earlier trip going to Huntington P.O., which you did not cover. By not reviewing your complete assignment, trip 6147/48 incurred a three-hour delay, which may result in delivery failures.

(*Id.* ¶¶ 29-30.) Chieffo signed the letter as the initial supervisor, and Barnes signed the letter as the concurring official. (*Id.* ¶ 31.) Plaintiff contacted the Union to file a grievance, but Chieffo denied the grievance because, pursuant to the Union agreement, probationary employees have no access to the grievance procedure for termination of their employment. (*Id.* ¶¶ 32-33.)

### 4. Treatment of Other Probationary Employees

Between January 2000 and November 2005, USPS hired 81 MVOs or tractor trailer operators (TTOs), all of whom were probationary employees for the first 90 days. (Dammas Decl. at Ex. A; Def.'s 56.1 ¶ 48.) Fifteen of those individuals were black (non-Hispanic) and plaintiff was the only black probationary MVO or TTO fired during that time period. (Dammas Decl. at Ex. A; Def.'s 56.1 ¶¶ 49-50.) Two other probationary drivers were terminated, both of whom were white. (Def.'s 56.1 ¶ 51.) In particular, in December 2000, Employee B was terminated from his position as an MVO during his probationary period for failure to follow safety procedures and failure to follow

instructions.[2] (Dammas Decl. at ¶ 9, Ex. C; Def.'s 56.1 ¶ 52.) Employee B requested reinstatement as a mail handler at a different location and, in February 2001, Employee B was reinstated as a Part Time Flexible Mail Handler at another USPS facility. (Dammas Decl., Ex. D; Def.'s 56.1 ¶ 54.) Employee C was terminated in January 2005 for failure to operate his vehicle in a safe manner. (Def.'s 56.1 ¶ 55.) A third employee, Employee A, was also involved in an accident during his probationary period when his vehicle rolled into a vehicle in front of him. (Def.'s 56.1 at ¶ 44.) Although there were no injuries or damage to the USPS vehicle, there was damage to the other vehicle. (Def.'s 56.1 ¶ 45; Def.'s Reply 56.1 ¶ 45; Stark Decl., Ex. F.) Employee A's supervisor at the time of the accident was Joseph Bennevento, and plaintiff never worked directly with Mr. Bennevento. (Def.'s 56.1 ¶¶ 46-47.) According to plaintiff, these probationary drivers were afforded the benefits of full investigations regarding the circumstances surrounding the incidents prior to any decision regarding potential disciplinary action. (Stark Decl., Ex. F and Ex. G.) According to defendant, USPS policy requires that any accident involving a motor vehicle, no matter how minor, must be documented by the supervisor in an accident report on Form 1769. (Chieffo Supp. Decl. ¶ 2.)

There is also evidence in the record regarding other delays in the delivery of mail occurred in connection with other probationary drivers, but such drivers were not disciplined. In particular, there are TIMES reports showing that, between May 2002 and 2004, there were three probationary employees (Employees D, E, and F), who were white and reported to Chieffo, but were not subject to any discipline by Chieffo for these delays in mail delivery.[3] (Stark Decl., Ex. H; Chieffo Dep. at 109.) For example, Employee D was involved in a 40-minute delay, but was not disciplined. (Ex. H, at 4.)

5. Racial Comments at Mid-Island

Plaintiff has submitted evidence seeking to demonstrate that race discrimination was historically tolerated at Mid-Island. More specifically, two African American MVOs at Mid-Island, Gladys Posey and Troy Woods, have stated that racial slurs were commonly used at Mid-Island from the time each was transferred to Mid-Island in 1992 and 1997, respectively. (Posey Dep. at 54, 57; Woods Decl. ¶ 5.) Both stated, among other things, that the "N word" was used frequently at Mid-Island by employees. (Posey Dep. at 56-57; Woods Decl. ¶¶ 5-7.) Posey stated that she complained to numerous supervisors at Mid-Island about such comments. (Posey Dep. at 46-48.) Moreover, according to Posey, she communicated these complaints to Barnes at least ten times for approximately two years, but no action was taken. (Posey Dep. at 46, 48-49, 51.) Woods submitted a declaration which, among other things, stated that Chieffo, who monitored the two-way radio and interrupted MVOs talking about personal matters (Woods Decl. ¶ 6.), tolerated these racial slurs:

---

[2] To protect the privacy of these other employees, the Court, as the parties did in their public filings, will refer to them by letter designations, rather than names.

[3] Plaintiff stated in his opposition brief that these other employees were white and reported to Chieffo, but does not cite to the record. (Plaintiff's Opposition Brief, at 19.) In its reply, defendant did not challenge these factual assertions.

5

During this stint on Tour 3, the ["N word"] and other offensive racial remarks were repeated at Mid-Island and over the two-way radio. Chieffo knew about the radio comments because they were repeated nearly every day with such frequency that anyone listening to the radio could not avoid hearing them. Despite the fact that Chieffo interrupted radio conversations unrelated to USPS business, I never heard any suggestion that racial epithets would not be tolerated. I believe that my co-workers used racial slurs with such frequency and without attempting to conceal their identities because they knew that there would be no discipline imposed for doing so.

(Woods Decl. ¶ 7.)

Plaintiff also testified that drivers assigned to Mid-Island used the two-way radio to communicate racial slurs, such as the "N word." (Downes Decl. ¶ 7; Downes Dep. at 134.) According to plaintiff, each USPS vehicle was equipped with a two-way radio to allow drivers to communicate with each other and supervisors regarding road and traffic conditions, as well as other work-related issues. (Downes Decl. ¶ 6.) Plaintiff testified that he heard the "N word" and other slurs "repeated with great frequency approximately every other day [he] worked for the USPS." (Downes Decl. ¶ 7.) Plaintiff, like Woods, stated that Chieffo regularly monitored two-way radio discussions and believed that such racial epithets were so regular and conspicuous that Mr. Chieffo had to have heard them. (Downes Decl. ¶ 7.) Plaintiff likewise stated that he never heard Chieffo chastise anyone for using such racial epithets. (Downes Decl. ¶ 7.)

B. PROCEDURAL HISTORY

Plaintiff filed a complaint in this action on June 9, 2004, alleging employment discrimination under Title VII on the basis of his race. The case was originally assigned to the Honorable Leonard D. Wexler and, on February 9, 2006, the case was reassigned to the undersigned. On June 6, 2006, defendant moved for summary judgment. Oral argument was held on July 7, 2006.

II. DISCUSSION

A. SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

6

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted). The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

B. LEGAL STANDARD FOR DISCRIMINATION CASES

Because plaintiff presents no direct evidence of discriminatory treatment based on his race, the Court reviews his claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case of racial discrimination under Title VII, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d

Cir. 2001).

Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (quoting *McDonnell Douglas*, 411 U.S. at 802))). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas'*s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Ass'n,* 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consolidated Edison Co. of N.Y.*, Inc., 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of McDonnell Douglas test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

C. DOWNES' RACE DISCRIMINATION CLAIM

At the outset, the Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas,* based upon, as discussed more fully below in connection with prong three, plaintiff's membership in the protected class, as well as evidence relating to the circumstances surrounding his termination, the treatment of white probationary employees, and racial comments at Mid-Island. In response, defendant has established a legitimate non-discriminatory reason for his dismissal, namely, plaintiff's failure to pick up the mail at one of his two assigned locations on July 22, 2003. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable

8

jury could find race discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999); *Lapsley*, 999 F. Supp. at 515.

In response to defendant's motion for summary judgment, plaintiff points to several pieces of evidence in support of his argument that a reasonable jury could find that defendant's proffered non-discriminatory reason for the termination was a pretext for race discrimination. First, plaintiff argues that there is evidence that the decision to terminate him was made on July 22, 2003 by Chieffo and/or Johnson prior to any investigation being conducted and that Barnes' actions on July 23, 2003 constituted simply approving a decision previously made. Second, plaintiff submits that there is evidence that similarly situated white probationary employees who damaged their USPS vehicle were either not terminated (Employee A) or were terminated only after a full investigation (Employees B and C). Third, plaintiff argues that the USPS TIMES report demonstrates that there were also similarly situated white probationary employees between May 2002 and 2004 who did not transport the mail in a timely fashion (Employees D, E, F), but were never disciplined for such delays. Finally, plaintiff argues that "[a]n inference of discrimination is further indicated by the open and conspicuous manner in which racist conduct was exposed at Mid-Island." (Plaintiff's Opposition Brief at 24). In particular, plaintiff asserts that there is evidence that the use of racial slurs was commonplace at Mid-Island in the presence of supervisors and during radio communications, that at least one employee unsuccessfully complained to supervisor Barnes and others for approximately two years about these racial slurs, and that the racial slurs were used by drivers over the two-way radio monitored by supervisor Chieffo, but he never chastised any drivers for such conduct.

Defendant argues that such evidence is insufficient to defeat the motion for summary judgment. Defendant's main arguments are the following: (1) plaintiff's claim that he was terminated without any inquiry is unsupported by the record; (2) the white probationary drivers who had delays in mail delivery, but were not disciplined, are not similarly situated to plaintiff because there is no evidence that these individuals caused the delay, which is in contrast to plaintiff's situation where he clearly made a mistake; and (3) plaintiff has failed to establish a connection between the alleged racial comments and his termination.

The Court recognizes that the fact that an employee disagrees with the results of an employer's investigation regarding misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not demonstrate, by itself, that the employer's proffered reasons are a pretext for termination. *See, e.g., Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761 (8th Cir. 1998) (stating that "the relevant inquiry was whether [plaintiff] created a genuine issue of material fact as to whether her discharge was gender-based and not whether her termination was reasonable" and noting that "[i]t is not the task of this court to determine whether [the investigator's] investigation was sufficiently thorough or fair"). However, having carefully examined the evidence contained in the record, the Court concludes that, when viewed as a whole and in the light most

9

favorable to plaintiff, the evidence creates genuine issues of material fact as to whether defendant's stated reason for terminating plaintiff was pretextual, and whether race was a factor in the termination decision. The evidence in the record – including the differing recollections regarding the conversation between Chieffo and Johnson on July 22 regarding plaintiff's termination even though no investigation had been conducted at that point, the evidence regarding more lenient disciplinary decisions relating to conduct of white probationary drivers (Employees D, E, and F), and evidence regarding the decision-makers' toleration of the use of racial slurs by employees at Mid-Island – provides a factual basis from which a jury could infer discriminatory intent and, thus, creates genuine issues of material fact that defeat defendant's motion for summary judgment.

The Court finds defendant's arguments, in support of the motion for summary judgment, unpersuasive. First, defendant argues that Barnes' involvement in the termination decision on July 23 undermines any claim by plaintiff that the termination decision occurred without any investigation. However, there is evidence in the record which would allow a reasonable jury to conclude that the initial decision to terminate plaintiff was made on July 22 (the night of the incident) at 8:00 p.m., prior to hearing plaintiff's explanation for the delay or conducting any investigation. In particular, supervisor Chieffo stated in his EEOC affidavit and his deposition that Acting Plant Manager Johnson told him at approximately 8:00 p.m. "to terminate this employee immediately." (Supp. Decl. of Dennis McGinn, Ex. S, at 2; Chieffo Dep. at 78-83.) Johnson, however, has no recollection of any involvement in such decision and stated he would not recommend such an action without an investigation, including questioning the driver. (Johnson Dep. at 52-57, 73-76.) Drawing all reasonable inferences in plaintiff's favor from the entire record, a jury could conclude that Chieffo made the decision to terminate plaintiff on July 22 without any investigation and sought to attribute that decision to Johnson to hide his improper racial motivation in the termination decision. *See, e.g., Golia v. Leslie Fay Co.,* 2003 WL 21878788, at *7 (S.D.N.Y. Aug. 7, 2003) ("[supervisor's] refusal to admit responsibility for the terminations could lead a reasonable factfinder either to reject defendant's entire account of the processes that led to plaintiffs' firings as completely inaccurate, or to conclude that, if [the supervisor] was indeed the decisionmaker, she is falsely denying responsibility because she is conscious that some wrongful motivation contributed to her decisions"); *accord Dickinson v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2006 WL 1273734, at *10-11 (D. Conn. May 5, 2006). Although it is far from clear from the record that Chieffo shifted his story regarding his involvement in the termination decision (as plaintiff contends), a jury can consider the difference between the recollections of Chieffo and Johnson, as to discussions about terminating plaintiff on July 22, in determining whether, in conjunction with other evidence, some inference of discrimination can be drawn from the process, or lack thereof, used to reach such a decision that evening. *See Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("[i]t is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment'") (quoting *Fischl v. Armitage*, 128 F.3d 50, 55-56 (2d Cir. 1997)).

Even assuming *arguendo* Barnes concurred in that decision the next day without any racial motivation, plaintiff could still establish a discrimination claim if he can show that Chieffo was motivated by racial factors in recommending termination. *See, e.g., Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (discriminatory comments of plaintiff's supervisor, who did not have formal firing authority but "who had enormous influence in the decision-making process," constituted direct evidence of discrimination); *Dickenson,* 2006 WL 1273734, at *11 (even if attorney were found to have conducted her part of the investigation in good faith and made final recommendation to fire plaintiff, decision relied heavily on compliance officer's statements to attorney and "the reasons that [defendant] proffers for the termination may have been reasons that [the compliance officer] originally created as a pretext for a different motivation"); *see also Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("evidence of a subordinate's bias is relevant where, as here, the ultimate decisionmaker is not insulated from the subordinate's influence"); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) ("If the employee can demonstrate that others had influence or leverage over the official decisionmaker . . . it is proper to impute their discriminatory attitudes to the formal decisionmaker."); *But see Hills v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 289-91 (4th Cir. 2004) (en banc) ("[W]e decline to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in adverse employment decision.").

Second, defendant claims that the white probationary drivers that had delays in the mail are not "similarly situated" and, thus, such evidence cannot be used as a matter of law to support plaintiff's prima facie case. The Court disagrees and finds that there is a genuine issue of fact on that issue that precludes summary judgment. It is well-settled that a plaintiff can raise an inference of discrimination by showing disparate treatment – namely, that a similarly situated employee outside the protected group received more favorable treatment. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). The law does not require the employees to be similarly situated in all respects, but rather requires that they be similarly situated in all *material* respects. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) ("A plaintiff is not obligated to show disparate treatment of an *identically* situated employee."); *accord Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). The Second Circuit has further defined what the term "all material respects" means in this context:

> What constitutes "all material respects"... varies somewhat from case to case and, as we recognized in *Norville,* must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness . . . . Hence, the standard

11

for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical . . . . The determination that two acts are of comparable seriousness requires – in addition to an examination of the acts – an examination of the context and surrounding circumstances in which those acts are evaluated.

*Graham v. Long Island R.R.*, 230 F.3d 34, 40-41 (2d Cir. 2000) (citations and quotations omitted).

In the instant case, with respect to the TIMES report, plaintiff is comparing himself to white employees (Employees D, E, and F) who share the same workplace standards – they are probationary MVO drivers and at least some of whom were supervised by the same person as plaintiff, Chieffo. In terms of the conduct, the white probationary employees also had delays in the delivery of the mail. Defendant argues that plaintiff has failed to demonstrate that such delays were the fault of the white probationary drivers and, thus, these employees are not similarly situated to plaintiff where the delay in the mail was due, at least in part, to plaintiff's error. Although the record is silent as to the cause of these delays by other employees, in light of the other similarities between plaintiff and these employees, the lack of evidence as to fault does not warrant a finding that no reasonable jury could view these employees as "similarly situated" to plaintiff. In addition, plaintiff contends that he was not at fault either. Specifically, although it is undisputed that he made the initial mistake in reading the route sheet incorrectly, he claims that the delay was not his fault because he realized the mistake within an hour and, if the phone lines had been working properly, he would have been able to alert his supervisors to the error and no delay in the mail would have occurred. Thus, there is even a disputed issue of fact here as to whether plaintiff was ultimately responsible for any delay in the mail. Under these circumstances, the Court cannot conclude that no reasonable jury could find the similarly situated requirement was met.[4] *See Graham*, 230 F.3d at 39 ("Whether two employees are similarly situated ordinarily presents a question of fact for the

---

[4] Plaintiff also argues that other white probationary employees (Employees A, B, an C) – who were involved in accidents with their trucks were either terminated after a full investigation or, in one instance, not terminated at all (Employee A) – are similarly situated to plaintiff and were given more favorable treatment. Defendant argues that the reason there were formal reports with respect to these accidents was because Postal Service policy, in fact, requires that any accident involving a car, no matter how minor, must be documented through a specific report. However, apart from the differing process, plaintiff also argues that, with respect to Employee A, the employee was clearly at fault because his truck rolled into another vehicle at an intersection, caused property damage, and yet he/she was not terminated. In response, defendant argues that the accident is not of "comparable seriousness" to plaintiff's delay in mail and the immediate supervisor as to these employees is not the same as plaintiff's supervisor. Although the existence of different supervisors is not necessarily dispositive under the Second Circuit case law in determining whether two employees are similarly situated, it is obviously a very important factor. *See Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465-66 (S.D.N.Y. 2006) (collecting cases). The Court, however, need not resolve this issue with respect to these employees in connection with the summary judgment motion because, as noted above, the other evidence – including the treatment of employees D, E, and F – are sufficient to defeat defendant's motion.

jury."); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (same).

Defendant's third point – that the alleged racist comments by employees unrelated to the termination decision cannot be used to establish pretext – is equally unavailing. In support of this argument, defendant cites to a line of cases for the proposition that "stray remarks in the workplace, statements by non-decisionmakers, and statements by decisionmakers unrelated to the decisional process are not by themselves sufficient to satisfy plaintiff's burden of proving pretext." *Argueta v. North Shore Long Island Jewish Health Sys., Inc.*, 2003 WL 22670915, at *8 (E.D.N.Y. Nov. 6, 2003) (citations and quotations omitted); *see also Orisek v. Am. Inst. of Aeronautics and Astronautics*, 938 F. Supp. 185, 192 (S.D.N.Y. 1996) ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus. [Plaintiff] must demonstrate a nexus exists between these allegedly discriminatory statements and the [defendant's] decision to terminate her.") (citations and quotations omitted), *aff'd mem.*, 162 F.3d 1148 (2d Cir. 1998).

These cases, however, are clearly distinguishable from the instant case. As a threshold matter, the alleged racist comments in the instant case are by no means isolated. Plaintiff stated that, on the two-way radio, he heard the "N word" and other slurs "repeated with great frequency approximately every other day [he] worked for the USPS." (Downes Decl. ¶ 7.) Another Mid-Island employee, Gladys Posey, testified that she heard the "N word" being used "constantly out of certain people's mouth." (Posey Dep. at 57.) A third employee, Troy Woods, testified that he heard racial slurs used, including on the two-way radio, "with frequency" and estimated that such remarks occurred over the two-way radio "nearly every day."[5] (Wood Decl. ¶¶ 5, 7.) In addition, these cases are distinguishable because, although there is no allegation that the decision-makers personally made these racial comments, plaintiff has set forth evidence that supervisors involved in his termination decision – Chieffo and Barnes – were aware of these types of comments by employees and tolerated them. For example, both plaintiff and Woods testified that Chieffo had to be aware about the racial comments over the radio because he monitored the radio, including interrupting radio conversations unrelated to USPS work, and, thus, had to have heard these racial comments which were repeated frequently.[6] (Woods Decl. ¶¶ 6-7;

---

[5] Defendant objects to plaintiff's reliance on Posey's hearsay testimony regarding a "story" she heard regarding the wearing of a KKK outfit by a supervisor at Mid-Island on Halloween. (Posey Dep. at 91-92.) The Court, however, does not rely on this hearsay testimony in concluding there is sufficient evidence to defeat defendant's summary judgment motion.

[6] Evidence that Chieffo was not the ultimate decision-maker, as noted earlier, does not mean that a jury cannot consider evidence demonstrating that he had racial animus and was significantly involved in plaintiff's termination decision. In any event, as noted above, plaintiff also points to evidence that Barnes, who was the concurring official, tolerated these racial slurs. Even though Barnes is black, a jury can consider evidence that Barnes also tolerated such racial comments, in conjunction with the other evidence, to infer discrimination in connection with the termination decision. *See Oncale v. Sundowner Offshore Servs, Inc.*, 523 U.S. 75, 78 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.") (citations and quotations omitted).

13

Downes Decl. ¶ 7.) Posey testified that she made numerous supervisors, including Barnes, aware of these racial slurs, but no action was taken. (Posey Dep. at 46-51.) Finally, this evidence regarding the use of racial slurs at Mid-Island is not the only evidence in this case. Instead, a jury can consider such evidence in conjunction with the other evidence in this case, including the circumstances surrounding plaintiff's termination and the treatment of white probationary employees who were involved in late mail deliveries.

In sum, although defendant has pointed to portions of the record that undermine the strength of various aspects of plaintiff's proffered evidence of discrimination as it relates to his termination, the evidence is sufficient for plaintiff to survive defendant's summary judgment motion.

### IV. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 26, 2006
Central Islip, New York

\* \* \*

The attorney for plaintiff is Michael G. O'Neill, Esq, 30 Vesey Street, Suite 301, New York, New York 10007. The attorneys for defendant are Roslynn R. Mauskopf, Esq., United States Attorney, Eastern District of New York by Denise McGinn, Esq., Assistant United States Attorney, Eastern District of New York, 610 Federal Plaza, 5th Floor, Central Islip, New York 11722.